United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GUILLERMO RIO, | No. C 05-1483 MHP (pr) |
|     Petitioner, | **ORDER DENYING HABEAS PETITION** |
|     v. | |
| BOARD OF PRISON TERMS COMMISSIONERS; A. P. KANE, warden, | |
|     Respondents. / | |

## INTRODUCTION

Guillermo Rio, a prisoner at the Correctional Training Facility in Soledad, filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254. This matter is now before the court for consideration of the merits of the pro se habeas petition. For the reasons discussed below, the petition will be denied.

## BACKGROUND

Guillermo Rio was convicted in Los Angeles County Superior Court of second degree murder and robbery and one of the principals was found to have been armed with a firearm at the time of the offense. He was sentenced to a total term of 16 years to life in 1987. His habeas petition does not concern that conviction directly, but instead focuses on a July 18, 2002 decision by a panel of the Board of Prison Terms ("BPT") finding him not suitable for parole.

1   The BPT identified several factors in support of its determination that Rio was not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if he was released.  The factors identified included the circumstances of the offense, his insufficient participation in beneficial self-help programs, and inadequate parole plans.   The specifics regarding the crime and the circumstances supporting the finding of unsuitability are described in the Discussion section later in this order.

Rio sought relief in the California courts.  The Los Angeles County Superior Court denied his petition for writ of habeas corpus in 2003 in a reasoned order.  See Resp. Exh. 9.  The California Court of Appeal summarily denied his petition for writ of habeas corpus and the California Supreme Court summarily denied his petition for review.

Rio then filed his federal petition for writ of habeas corpus.  The court construed Rio's federal petition for writ of habeas corpus to allege two claims:  (1) his right to due process was violated because there was not sufficient evidence to support the BPT's decision and (2) his right to due process was violated because the decision-maker was biased against him.  After an unsuccessful motion to dismiss, respondent filed an answer.  Petitioner filed a traverse.  The matter is now ready for a decision on the merits.

**JURISDICTION AND VENUE**

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the challenged action occurred at the Correctional Training Facility in Soledad, in Monterey County, California, within this judicial district.  28 U.S.C. §§ 84, 2241(d).

**EXHAUSTION**

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court.  See 28 U.S.C. § 2254(b), (c).  The parties do not dispute that state court remedies were exhausted for the claims asserted in the petition.

**STANDARD OF REVIEW**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); see Williams (Terry) v. Taylor, 529 U.S. 362, 409-13 (2000). Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of parole. See Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

**DISCUSSION**

A.   Sufficiency Of Evidence Claim

   1.   Due Process Requires That Some Evidence Support A Parole Denial

A California prisoner with a sentence of a term of years to life with the possibility of parole has a protected liberty interest in release on parole and therefore a right to due process in the parole suitability proceedings. See Sass, 461 F.3d at 1127-28; Board of Pardons v. Allen, 482 U.S. 369 (1987); Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1 (1979); Cal. Penal Code § 3041(b).

A parole board's decision satisfies the requirements of due process if "some evidence" supports the decision. Sass, 461 F.3d at 1128-29 (adopting some evidence standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)). "To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached'" by the parole board. Id. at 1128 (quoting

Superintendent v. Hill, 472 U.S. at 455-56).  The "some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the . . . board were without support or otherwise arbitrary.'"  Id. at 1129 (quoting Superintendent v. Hill, 472 U.S. at 457).  The some evidence standard of Superintendent v. Hill is clearly established law in the parole context for purposes of § 2254(d).  Sass, 461 F.3d at 1129.

A critical issue in parole denial cases concerns the BPT's use of evidence about the murder that led to the conviction.  Two cases provide the guideposts for applying the Superintendent v. Hill some evidence standard on this point.  In Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003), the court explained that the value of the criminal offense fades over time as a predictor of parole suitability: "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. . . . A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation."  Biggs, 334 F.3d at 916-17.  Biggs upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . . , should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole."  Id. at 916.  The recent decision of Sass criticized the Biggs statements as improper and beyond the scope of the dispute before the court:  "Under AEDPA it is not our function to speculate about how future parole hearings could proceed."  Sass, 461 F.3d at 1129.  Sass determined that the parole board is not precluded from relying on unchanging factors such as the circumstances of the commitment offense or the petitioner's pre-offense behavior in determining parole suitability. See id. at 1129 (commitment offenses in combination with prior offenses provided some evidence to support denial of parole at subsequent parole consideration hearing).  The Sass and Biggs decisions are not polar opposites and can be harmonized:  the BPT can look at immutable events, such as the nature of the conviction offense and pre-conviction

4

criminality, to predict that the prisoner is not currently suitable for parole (<u>Sass</u>), but the weight to be attributed to those immutable events decreases over time as a predictor of future dangerousness as the years pass and the prisoner demonstrates favorable behavior (<u>Biggs</u>). The one way in which <u>Sass</u> limits <u>Biggs</u> is to put to rest any idea that the commitment crime and pre-offense behavior only support the initial denial of parole. The immutable events may support the decision to deny parole not just at the first parole consideration hearing but also at subsequent hearings. However, <u>Sass</u> did not dispute the principle that, other things being equal, a murder committed 50 years ago is less probative of a prisoner's current dangerousness than one committed 10 years ago. Not only does the passage of time in prison count for something, exemplary behavior and rehabilitation in prison counts for something according to <u>Biggs</u>. <u>Superintendent v. Hill</u>'s standard might be quite low, but it does require that the decision <u>not</u> be arbitrary, and reliance on only the facts of the crime might eventually make for an arbitrary decision.

Having determined that there is a due process right, and that some evidence is the evidentiary standard for judicial review, the next step is to look to state law because that sets the criteria to which the some evidence standard applies. One must look to state law to answer the question, "'some evidence' of what?"

     2.     <u>State Law Standards For Parole For Murderers In California</u>

California uses indeterminate sentences for most non-capital murderers, with the term being life imprisonment and parole eligibility after a certain minimum number of years. A first degree murder conviction yields a base term of 25 years to life and a second degree murder conviction yields a base term of 15 years to life imprisonment. See <u>In re Dannenberg</u>, 34 Cal. 4th 1061, 1078 (Cal.), <u>cert. denied</u>, 126 S. Ct. 92 (2005); Cal. Penal Code § 190. The upshot of California's parole scheme described below is that a release date normally must be set unless various factors exist, but the "unless" qualifier is substantial.

A BPT panel meets with an inmate one year before the prisoner's minimum eligible release date "and shall normally set a parole release date. . . . The release date shall be set in a manner that will provide uniform terms for offenses of similar gravity and magnitude in

5

1  respect to their threat to the public, and that will comply with the sentencing rules that the
2  Judicial Council may issue and any sentencing information relevant to the setting of parole
3  release dates." Cal. Penal Code § 3041(a). Significantly, that statute also provides that the
4  panel "shall set a release date unless it determines that the gravity of the current convicted
5  offense or offenses, or the timing and gravity of current or past convicted offense or offenses,
6  is such that consideration of the public safety requires a more lengthy period of incarceration
7  for this individual, and that a parole date, therefore, cannot be fixed at this meeting." Cal.
8  Penal Code § 3041(b).

One of the implementing regulations, 15 Cal. Code Regs. § 2401, provides: "A parole date shall be denied if the prisoner is found unsuitable for parole under Section 2402(c). A parole date shall be set if the prisoner is found suitable for parole under Section 2402(d). A parole date set under this article shall be set in a manner that provides uniform terms for offenses of similar gravity and magnitude with respect to the threat to the public."[1] The regulation also provides that "[t]he panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison." 15 Cal. Code Regs. § 2402(a). The panel may consider all relevant and reliable information available to it. 15 Cal. Code Regs. § 2402(b).

The regulations contain a matrix of suggested base terms for several categories of crimes. See 15 Cal. Code Regs. § 2403. For example, for second degree murders, the matrix of base terms ranges from the low of 15, 16, or 17 years to a high of 19, 20, or 21 years, depending on some of the facts of the crime. Some prisoners estimate their time to serve based only on the matrix. However, going straight to the matrix to calculate the sentence puts the cart before the horse because it ignores critical language in the relevant statute and regulations that requires the prisoner first to be found suitable for parole.

The statutory scheme places individual suitability for parole above a prisoner's expectancy in early setting of a fixed date designed to ensure term uniformity. Dannenberg,

6

1  34 Cal. 4th at 1070-71.  Under state law, the matrix is not reached unless and until the
2  prisoner is found suitable for parole.  Id. at 1070-71; 15 Cal. Code Regs. § 2403(a) ("[t]he
3  panel shall set a base term for each life prisoner who is found suitable for parole").  The
4  California Supreme Court's determination of state law in Dannenberg is binding in this
5  federal habeas action.  See Hicks v. Feiock, 485 U.S. 624, 629-30 (1988).
6       The California Supreme Court also has determined that the facts of the crime can
7  alone support a sentence longer than the statutory minimum even if everything else about the
8  prisoner is laudable.  "While the Board must point to factors beyond the minimum elements
9  of the crime for which the inmate was committed, it need engage in no further comparative
10 analysis before concluding that the particular facts of the offense make it unsafe, at that time,
11 to fix a date for the prisoner's release."  Dannenberg, 34 Cal. 4th at 1071; see also In re
12 Rosenkrantz, 29 Cal. 4th 616, 682-83 (Cal. 2002), cert. denied, 538 U.S. 980 (2003) ("[t]he
13 nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole"
14 but might violate due process "where no circumstances of the offense reasonably could be
15 considered more aggravated or violent than the minimum necessary to sustain a conviction
16 for that offense").
17      3.    Some Evidence Supports The BPT's Decision In Rio's Case
18      The BPT identified several factors supporting its decision to find Rio unsuitable for
19 parole, i.e., the circumstances of the offense, the fact that he had not participated sufficiently
20 in beneficial self-help programs, his poor parole plans, and the district attorney's opposition
21 to parole.  The Los Angeles County Superior Court upheld the decision in a reasoned order.
22 See Exh. 7.  The Los Angeles court stated that some evidence had to support the decision and
23 found that some evidence did support the decision.  See id. at 1-2.  The state court identified
24 the correct legal standard, as evidenced by its citation to In re Rosenkrantz, 29 Cal. 4th at
25 656-57, which had cited and adopted the Superintendent v. Hill some evidence standard as
26 the proper standard for judicial review of evidentiary sufficiency for parole denial cases.  See
27 Rosenkrantz, 29 Cal. 4th at 665-67.  Because the Los Angeles County Superior Court's
28 decision is the last reasoned decision, that is the decision to which 2254(d) applies.  See Ylst

1  v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92
2  (9th Cir. 2005), cert. denied, 126 S. Ct. 2041 (2006).

### a. Commitment Offense

The BPT considered the circumstances of the murder and concluded that it was an carried out in a cruel and callous manner, carried out in a manner which demonstrates exceptionally callous disregard for human suffering, and was done for a trivial motive. RT 39. The BPT commissioner recited the facts of the crime from the appellate decision: Rio and his crime partners Amaro and Willie went to Roberto Hernandez's apartment under the pretense of purchasing jewelry. RT 7-8. Hernandez left the apartment to obtain jewelry and, when he returned, Amaro "grabbed the victim around the arms, preventing him from being able to get his gun. Apparently the victim had a gun also. And this [crime partner] Willie pulled out a handgun, said it's a robbery, told no one to move. [Rio] grabbed one of the witnesses, threw him on the floor and sat on him. It was at that point another witness looked up and saw the victim struggling with Mr. Amaro. And this Willie person walked over, put the gun to the back of Mr. Hernandez' head and fired." RT 8. Amaro, Willie and Rio fled. Rio was arrested several months later in San Diego.

The Los Angeles County Superior Court found there was sufficient evidence on this factor: "Petitioner and his crime partners perpetrated a robbery on the victim. Petitioner restrained one witness while his crime partners restrained the victim and, ultimately, shot the victim in the head. . . .As such, there is 'some evidence' to support the Board's finding that the commitment offense demonstrates a callous disregard for human suffering and was animated by a trivial motive." Resp. Exh. 7 at 1.

A circumstance tending to indicate unsuitability for parole is that "the prisoner committed the offense in an especially heinous, atrocious or cruel manner." 15 Cal. Code Regs. § 2402(c)(1). The factors to be considered in determining whether that circumstance exists are that there were multiple victims, "[t]he offense was carried out in a dispassionate and calculated manner, such as an execution-style murder," "[t]he victim was abused, defiled or mutilated during or after the offense," "[t]he offense was carried out in a manner which

8

1  demonstrates an exceptionally callous disregard for human suffering," and "[t]he motive for
2  the crime is inexplicable or very trivial in relation to the offense." 15 Cal. Code Regs. §
3  2402(c)(1). The BPT considered a circumstance proper under California law.
4       There was not sufficient evidence to support the finding that the circumstances of the
5  commitment offense tended to show unsuitability. The BPT looked at the killing without any
6  attention paid to Rio's role in that killing. The BPT's approach fails to distinguish between
7  the actual killer and those who may be held liable based on their role in the crime such as
8  aiding and abetting or under a felony murder theory as it rates all of them the same on the
9  dangerousness scale. Not only does that approach seem contrary to common sense, it also is
10 contrary to the wording of the regulation. The regulation calls on the BPT to consider
11 whether "[t]he prisoner committed the offense in an especially heinous, atrocious or cruel
12 manner," indicating that the focus is on the parole candidate's particular actions in the killing.
13 See 15 Cal. Code Regs. § 2402(c)(1) (emphasis added). Admittedly, the regulation is not
14 consistent, as the circumstance refers to the prisoner's conduct, but the factors in support of
15 that circumstance focus on the criminal acts or victim rather than the prisoner's acts, e.g.,
16 whether "multiple victims were attacked, injured or killed," whether "the offense was carried
17 out" in a particular way, whether the "victim was abused, defiled or mutilated," and the
18 motive for the crime. See 15 Cal. Code Regs. § 2402(c)(1)(A-E). The regulation, like
19 California Penal Code § 3041(b), calls for an individualized consideration of this prisoner's
20 suitability for parole.
21      Here, Rio was present when his crime partner killed the victim. The evidence also
22 was that Rio was there for a robbery and the shooting of the victim was rather unexpected to
23 Rio. There was no evidence that Rio was the leader of the criminal episode, and no evidence
24 that Rio directed the killing or otherwise urged the killer to kill. Under the circumstances,
25 his crime partner's execution-style killing does not provide some evidence that Rio
26 "committed the offense in an especially heinous, atrocious or cruel manner." Cf. Biggs v.
27 Terhune, 334 F.3d at 912, 916 (prisoner had refused to actually kill the victim but agreed to
28 be involved in the ruse to murder him, was present during the murder, paid money to the co-

9

1 conspirators, and returned with the killer in an attempt to better conceal the body; "While
2 Biggs did not commit the murder himself, he was intertwined with the conspiracy from the
3 very beginning.")

4       The BPT found the motive inexplicable.  Crime partner Amaro was struggling with
5 the victim (who may or may not have been reaching for his gun) and Willie walked over and
6 shot the victim in the back of the head. The motive for killing the victim may have been to
7 facilitate the robbery or to avoid the victim gaining control of a gun.  However, due to the
8 absence of evidence that Rio led the criminal episode, directed the killing or otherwise urged
9 the killer to kill, the idea of another person's motive being attributed to Rio defies common
10 sense.  Whatever motivated his crime partner to kill the victim does not provide some
11 evidence that Rio "committed the offense in an especially heinous, atrocious or cruel
12 manner."

13       The state may hold a person criminally liable when his crime partner kills during a
14 robbery, but the BPT has a different chore.  The BPT is charged with determining whether a
15 prisoner is suitable for parole, not whether he may be held liable for the killing in the first
16 place.   The state court's decision upholding the BPT's determination that the circumstances
17 of the crime supported a finding that Rio was unsuitable for parole was an unreasonable
18 application of <u>Superintendent v. Hill</u>.  Like the BPT, the state court failed to determine
19 whether there was evidence that "[t]he prisoner committed the offense in an especially
20 heinous, atrocious or cruel manner," as required by the regulation.  The evidence in the
21 record does not support a finding that Rio committed the offense in an especially heinous,
22 atrocious or cruel manner.

23         b.    <u>Need For Further Programming</u>

24       The BPT found that Rio had not sufficiently participated in beneficial self-help and
25 therapy programming in prison.  The BPT recognized that Rio had favorable work
26 evaluations, had received no CDC-115s (rules violation reports) but had received four CDC-
27 128s (counselling reports, the last of which was in 1997).  The BPT saw a need for further
28 work on substance abuse problems, however.  Rio had a substance abuse problem and had

10

1  not participated in enough programming to address that problem. Rio had attended
2  Alcoholics Anonymous or Narcotics Anonymous classes, but had only attended for about six
3  months in 1994, and had not done anything since then. Rio told the BPT that, the last time
4  he went to a meeting, he was told to do it in Spanish and there was no Spanish AA or NA
5  program available to him. RT 22, 30. He offered no evidence to prove that he had made any
6  effort to seek out Spanish language AA or NA programs or other self-help programs that
7  might be available in Spanish since then.

    The Los Angeles County Superior Court found that some evidence supported the
BPT's determination on the need for further self-help programming. See Resp. Exh. 7 at 1.
The court noted that there was a 1999 psychological evaluation that observed that the "most
significant precursor to Petitioner's violence is a resumption of illegal drug use and alcohol
consumption. [RT 23-24.] In light of Petitioner's admission of alcohol and illegal drug use
(see id. at 18-19) and Petitioner's failure to sufficiently participate in self-help programs to
address such issues (see id. at 22), there is some evidence to support the Board's finding that
Petitioner would pose an unreasonable risk of danger to society if released from prison."
Resp. Exh. 7 at 1.

    Consideration of and reliance on Rio's need for further programming was not
improper. Section 2402(b) specifically allows the BPT to consider a great range of relevant
and reliable information, such as the prisoner's social history and mental state.

    The BPT' concern about the risk of Rio returning to drug abuse was reasonable and
there was evidence in the record to support the determination that the need for further
programming supported a finding of unsuitability. Although Rio had participated in AA and
NA 12-step type programs, he had only participated for six months and that was eight years
before the hearing. There was some evidence to support the BPT's determination that Rio
needed further programing to avoid the risk of him returning to substance abuse that would
increase the likelihood of failure on parole. The BPT had a psychologist's report that the
most significant risk factor for Rio's violence potential increasing beyond average would be
the use of alcohol and illegal drugs. RT 23-24. And Rio's counselor had opined that Rio

11

1 would benefit from completing academic training and resuming his participation in self-help
2 programs.

      c.   <u>Absence Of Parole Plans</u>

4   The BPT's decision to find Rio unsuitable was based also on the BPT's belief that his
5 parole plans were lacking in certainty.  Rio had come to the United States in the "Freedom
6 Flotilla" from Cuba in 1981.  A BPT commissioner noted that there might be an INS hold for
7 Rio, but he would not be removed because he was from Cuba; Rio would be remaining in the
8 United States, even if he had to spend some time in federal prison while the INS processed
9 him.  Rio responded that he would "make a living working" as a tire man or a shoemaker.
10 RT 27.   Rio had not told his family where he was or that he was in prison.  <u>See</u> RT 19, 31-
11 32, 35.  He claimed he had family and friends to go to in Miami, but did not know where his
12 family lived.  He expected that the immigration authorities would contact his relatives
13 because he did not know where they lived in the Miami area.  RT 28.  Rio had not attempted
14 to find any place to parole in California.  He had been unable to locate a cousin who lived in
15 California because he had been traveling.  RT 29.

16   The Los Angeles County Superior Court found that there was some evidence to
17 support the finding that the parole plans were inadequate. Resp. Exh. 7 at 2.

18   The BPT properly could consider the uncertain nature of the parole plans in support of
19 its decision under § 2402(b), which allows the BPT to consider "any other information which
20 bears on the prisoner's suitability for release."

21   There was much more than some evidence to support for the BPT's finding that the
22 lack of parole plans indicated unsuitability.  Rio basically had <u>no</u> parole plans.  He had no
23 place to live, no family support, and no job arranged if he was released from prison.  At most,
24 he had a hunch he had some relatives in Miami that he could go to, but expected the
25 immigration authority to find those relatives for him.  There was no evidence of how he
26 would pay for his transportation to the Miami area where these people supposedly lived.
27 Although he didn't state this at the hearing, he now urges that the immigration authority "will
28 install him in a federally sponsored half-way house, until he finds a job and a residence

12

1 suitable for him as far as those officials are concerned," but provides no evidence to support
2 that belief.  See Petition, p. 6(g).

3 Rio argues that he was crime-free in Cuba and only engaged in criminal activity when
4 he felt alienated and had difficulty adjusting to American society.  Petition, pp. 6(n), 6(z)(2).
5 The same problems are likely to exist if he is released from prison and may be worse because
6 he now will have a serious criminal record to add to his other burdens.  Rio had done little to
7 avoid ending up in the same circumstances again:  he had not participated since 1994 in any
8 program to address his substance abuse problem which was identified as a key factor in
9 determining the likelihood of him again engaging in criminal activity, he had not pursued any
10 education (to supplement his fourth grade education in Cuba), he had not lined up a job or
11 place to live if he was paroled, and he had chosen to avoid contact with his family.

                   d.        There Was Enough Evidence To Support The Decision

13 As explained above, there is not some evidence to support the finding that Rio is
14 unsuitable based on the nature of the commitment offense.  However, there is some evidence
15 to support the determination that Rio's need for further self-help programming and his
16 inadequate parole plans made him unsuitable for parole at the 2002 hearing.  These
17 circumstances could be considered in determining parole suitability.  "Circumstances which
18 taken alone may not firmly establish unsuitability for parole may contribute to a pattern
19 which results in a finding of unsuitability."  15 Cal. Code Regs. § 2402(b).

20 The Los Angeles County Superior Court's rejection of Rios' insufficient evidence
21 claim was not contrary to or an unreasonable application of the Superintendent v. Hill some
22 evidence standard.  The state court identified three circumstances that provided some
23 evidence of parole unsuitability.  Although the state court's determination that the
24 circumstances of the crime provided some evidence of unsuitability was an unreasonable
25 application of the Superintendent v. Hill standard, the state court's determination that the
26 inadequate participation in self-help programs and the lack of parole plans provided some
27 evidence to support the BPT's decision were reasonable determinations under Superintendent
28 v. Hill.  Moreover, even if viewed with no deference to the state court's decision, the

existence of those two circumstances provided some evidence to support the BPT's decision that Rio was not suitable for parole. Rio is not entitled to the writ on this claim.

B.      Biased Decision-Maker Claim

Rio argues that the BPT was a biased decision-maker. Even if he could establish factual support for this claim, he already has obtained the relief to which he would be entitled.

A "'fair trial in a fair tribunal is a basic requirement of due process.' . . . This applies to administrative agencies which adjudicate as well as to courts." Withrow v. Larkin, 421 U.S. 35, 46 (1975) (citations omitted) (combination of investigative and adjudicative functions does not necessarily show a biased decision-maker); see also Morrissey v. Brewer, 408 U.S. 480, 489 (1972) (due process requires neutral and detached decision-maker for parole revocation hearing).

To determine the correct remedy for a biased decision-maker claim, the court looks to the analogous situation of a biased judge in a criminal case. A biased judge in a criminal case is deemed a structural error and not subject to harmless error analysis. See Tumey v. Ohio, 273 U.S. 510, 531-32 (1927) (trial by biased judge); Campbell v. Rice, 408 F.3d 1166, 1172 (9th Cir.), cert. denied, 126 S. Ct. 735 (2005). The remedy for a structural error such as a biased judge in a criminal trial is a new trial free of the error. By analogy, the remedy for a parole decision-maker in a parole suitability hearing should be a new parole suitability hearing when there is some evidence to support the decision reached.

Assuming for the purposes of argument that the BPT panel that heard Rio's case was a biased decision-maker, the habeas remedy would be to order a new hearing by a decision-maker that was not biased. That has already occurred here. Rio had a subsequent parole hearing in 2005. The bias he claims existed was based on former Governor Gray Davis' alleged no-parole policy, but the former governor's policies and statements cannot be attributed to his successor. Rio has presented no evidence of a no-parole policy by Governor Schwarzenegger or the BPT panel under Governor Schwarzenegger's administration that held Rio's subsequent parole hearing in 2005. The writ will not be granted on the biased decision-

14

maker claim.

## CONCLUSION

For the foregoing reasons, the petition is denied on the merits. The clerk shall close the file.

IT IS SO ORDERED.

DATED:   December 21, 2006

Marilyn Hall Patel
United States District Judge

**NOTE**

1.      The listed circumstances tending to show <u>unsuitability</u> for parole are the nature of the commitment offense, i.e., whether the prisoner committed the offense in "an especially heinous, atrocious or cruel manner;" the prisoner has a previous record of violence; the prisoner has an unstable social history, the prisoner previously engaged in a sadistic sexual offense, the prisoner has a lengthy history of severe mental problems related to the offense; and negative institutional behavior.  15 Cal. Code Regs. § 2402(c).  The listed circumstances tending to show <u>suitability</u> for parole are the absence of a juvenile record, stable social history, signs of remorse, a stressful motivation for the crime, whether the prisoner suffered from battered woman's syndrome, lack of criminal history, the present age reduces the probability of recidivism, the prisoner has made realistic plans for release or developed marketable skills, and positive institutional behavior.  15 Cal. Code Regs. § 2402(d).